**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DONALD J. FISHER, II, | ) CASE NO. 1:23-CV-00508-CEH |
| Plaintiff, | ) |
| | ) JUDGE CARMEN E. HENDERSON |
| v. | ) UNITED STATES MAGISTRATE JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) MEMORANDUM OF OPINION & ORDER |
| Defendant, | ) |
| | ) |

**I. Introduction**

Plaintiff, Donald J. Fisher, II ("Fisher" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 8). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

**II. Procedural History**

On October 2, 2020, Claimant filed an application for DIB, alleging a disability onset date of February 17, 2020. (ECF No. 7, PageID #: 120). The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On February 15, 2022, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (*Id.*). Claimant subsequently amended his alleged onset date to August 31, 2020. (*Id.*). On May 20, 2022, the ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID #120-136). The ALJ's decision became final on January 11, 2023, when the Appeals Council declined further review. (*Id.* at PageID #: 35).

1

On March 13, 2023, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 10, 13, 14). Claimant asserts the following assignments of error:

> (1) The ALJ erred at Step Three of the Sequential Evaluation when she failed to comply with the relevant Social Security Rulings, 17-2p and 19- 2p, and find that the combination of Plaintiff's obesity and residuals from his strokes equaled a Listing.
>
> (2) The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF No. 10 at 1).

## III. Background

### A. Relevant Allegations

The ALJ summarized Claimant's allegations based on the relevant testimony from Claimant's hearing and a function report from Claimant's wife:

> The claimant alleged that he was unable to perform work due to the limiting signs and symptoms associated with his impairments. He testified that he relied on his daughter to perform most of the household chores, and that he must bathe and dress while seated due to balance issues. He explained that he did not drive due to issues with his right arm and hand and that he can walk no more than three blocks at one time. He explained that after his hospitalization in August 2020, he [sic] words got jumbled and slurred when he spoke, that he had difficulty with short-term memory, and that he was unable to tolerate heat. He explained that he had no strength in his right hand and describe associated numbness. The claimant reported that he used a mobile cart when shopping, that he needed four to five breaks when walking, and that he required the use of a stool when performing his part-time work as a cashier.
>
> The claimant's wife, Juaneina Fisher, completed a third-party function report for the claimant on January 12, 2022. She outlined that he was easily exhausted, that he had weakness in his right upper and lower extremities, and that he easily lost his balance. He had difficulty signing his name, his speech was slurred, and he required her assistance organizing his medication due to his memory deficits. She explained that he could lift no more than 10 to 15 pounds, and noted that he had limitations with squatting, bending, reaching, sitting, kneeling, stair climbing, completing tasks, and following instructions. Further, she explained that he experienced

2

depression due to his loss of physical abilities (10E).

(ECF No. 7, PageID #: 128).

### B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

The claimant experienced signs and symptoms associated with his severe impairments. The record reflects that he has a history of a closed displaced fracture of the base of the fifth metacarpal bone of the right hand in May 2014 (3F/24). On August 31, 2020, he presented to the emergency department with concerns for recurrent falls. He explained that earlier that day his left leg suddenly gave way, and he described intermittent dizziness, headache, and blurred vision. A head CT scan revealed no acute intracranial finding. However, there was evidence of cerebral and cerebellar atrophy, lacunar infarcts in the bilateral basal ganglia, as well as a confluent lucency in cerebral white matter that may be referrable to advanced chronic microvascular ischemic disease. He was admitted for additional treatment, to include introduction of a blood thinner, anticoagulant medication, and anti-hypertensives. A CT scan of his cervical spine showed C4-5 spondylosis with mild central canal stenosis and moderate bilateral neural foraminal stenoses; ossification of posterior longitudinal ligament at C5; C3-C4 moderate left neural foraminal stenosis; and slight reversal of cervical lordosis at C4-05. A brain MRI revealed multiple minute acute lacunar infarcts involving the right periventricular and deep white matter and to a lesser degree the right parietal cortex, in a distribution suggestive of embolic episode; atrophy and chronic ischemic changes, out of proportion to patient's age, with bilateral remote lacunar infarcts in the basal ganglia; and no intracranial hemorrhage, mass, or abnormal contrast enhancement. A cervical spine MRI degenerative changes and disc disease with mild bilateral foraminal stenosis, but no myelopathy. An ultrasound of the claimant's bilateral carotid arteries showed less than 50 percent stenosis of the internal carotid arteries bilaterally. An echocardiogram showed moderately decreased left ventricular systolic function with an estimated ejection fraction is 35-39 percent, a moderately hypokinetic anteroseptal, normal right ventricle function, and a mildly dilated left atrial size. Additionally, an electrocardiogram (EKG) showed atrial fibrillation with evidence of left anterior fascicular block and poor R-wave progression. He underwent a transesophageal echo and cardioversion. Upon discharge on September 3, 2020, his heart was in normal sinus rhythm. His discharge diagnoses included suspected cardioembolic strokes/cerebrovascular accident, systolic heart failure, and newly diagnosed atrial fibrillation status post successful cardioversion (2F/8-154, 3F/26-42).

The claimant sought treatment for his severe impairments. On September 15, 2020, he presented for a follow up on his diagnoses that included cervical spondylosis, cerebral vascular accident, lacunar infarct, moderate aortic stenosis, new onset atrial fibrillation, and right hand fracture. He reported numbness and tingling while

his wife described issues with memory loss. He appeared oriented and in no distress upon examination and exhibited a normal heart rate with a regular rhythm. He had normal musculoskeletal range of motion, and his affect was normal. No changes were made to his treatment regimen, and he was encouraged to exercise (4F/7-13). During a hospitalization follow up with Raj Vallabhaneni, MD on September 17, 2020, he described shortness of breath on exertion, but denied chest pain. Upon examination, his lungs were clear to auscultation and no heart murmur was appreciated. His gait was normal, and he had no spinal tenderness. An EKG showed atrial fibrillation. His treatment regimen was updated to include coumadin and an increased dosage of carvedilol (2F/166-167). On September 23, 2020, he underwent cardioversion for his assessed paroxysmal atrial fibrillation. The treatment notes reflect that the procedure was successful and that the post-procedure findings included normal sinus rhythm (2F/156-171). The claimant presented for a neurology evaluation with Patrick Tessman, MD on September 25, 2020. He described right greater than left numbness in his hands but noted some mild improvement with his dizziness and lightheadedness. Upon examination, he was alert, oriented, and in no acute distress. His speech was normal and his cranial nerves were intact. He had normal motor strength with no drift in his extremities and his sensation was normal to all modalities. While his gait and station were unsteady, his finger to nose coordination was normal and he exhibited no ataxia. Dr. Tessman outlined that the claimant was neurologically stable and "making good strides" following his stroke. Electrodiagnostic testing of his upper extremities was recommended to determine the cause of his upper extremity paresthesias (1F/8-9).

Treatment for the claimant's severe impairments continued. On September 28, 2020, he underwent a physical therapy assessment with concerns of overall weakness, a feeling as though he was dragging his right leg, numbness/tingling in his right leg, and frequent lightheadedness. Evaluation findings included 4 to 4+/5 strength in his right lower extremity, 4+/5 left knee extension strength, decreased right heel strike when ambulating, and increased lightheadedness with vertical head movements. He was assessed with impaired balance and gait as well as lower extremity weakness. However, he did not use an assistive device to ambulate (3F/53-56). As of his October 9, 2020 session, he exhibited improved balance with both dynamic and static activities. Additionally, he reported a decrease in frequency of his lightheadedness/dizziness (2F/172-173). A cardiac study from October 15, 2020 showed a normal-sized left ventricle, overall normal left ventricular systolic function with an ejection fraction between 60-65 percent, a mildly dilated left atrium, and mild tricuspid regurgitation, but no evidence of aortic regurgitation or mitral regurgitation (3F/57).

The record reflects no sustained worsening in the signs and symptoms associated with the claimant's severe impairments. During an evaluation with Harbhajan Parmar, MD on October 29, 2020, he reported feeling fatigued. An EKG revealed atrial fibrillation, and he exhibited an irregularly irregular heart rate upon examination. However, he was alert, oriented, and displayed a normal gait, mood, memory, affect, and judgment. Upon consultation with the claimant's cardiologist,

4

he was to follow up as an outpatient to decide whether to perform cardioversion (4F/14-19). On November 24, 2020, he reported feeling exhausted and that it takes him a bit to get going in the morning. He appeared oriented, alert, and in no acute distress upon examination. He had full range of motion of his neck, his heart rate was normal, and he exhibited a regular heart rhythm. Dr. Parmar assessed that the claimant was "doing better," made no changes to his treatment regimen, and advised him to exercise (4F/20-25).

The claimant presented for a psychological consultative telehealth examination with Brian Griffiths, PsyD on January 8, 2021. He reported he applied for disability due to the residual effects of his "mini-strokes" and also described experiencing depression. However, he denied mental health treatment at that time. He explained that loss of functioning and independence as well as financial hardship were ongoing sources of stress and became tearful when discussing his situation. He indicated that he was no longer able to engage in activities he used to enjoy due to his physical limitations and noted that his energy level was low. The claimant also indicated that he had memory problems, impaired attention and concentration, and slow mental processing. Upon examination, he presented as polite, friendly, and cooperative with no loose associations, flights of ideas, or delusional beliefs. His mood was depressed, his affect was flat, and he was tearful. Nonetheless, he displayed no autonomic or motoric indications of anxiety. The claimant did not appear confused, did not ask the examiner to repeat and/or clarify questions, and had adequate remote recall. He remembered three of three objects after a five-minute delay and recalled five digits forward and four digits backwards. He performed five iterations of serial sevens correctly, counted from 20 by threes without error, and performed simple mental calculations correctly. Further, his judgment appeared adequate for making decisions affecting his future and conducting his own living arrangements. He was assessed with unspecified depressive disorder and unspecified neurocognitive disorder for which additional psychological testing would be helpful to bolster the diagnostic reliability (6F).

Based on the evaluation, Dr. Griffiths provided the following functional assessment. In the area of understanding, remembering, and carrying out both one-step and complex instructions, he denied a history of special education and reported he obtained his GED. His estimated premorbid level of intellectual functioning fell in the average range, and he understood and followed instructions during the evaluation. His performance on digit span, a simple structured task to assess short-term memory skills, fell in the average range and he recalled three of three objects after a delay. In terms of his abilities to sustain concentration and persist in work-related activity at a reasonable pace, he did not ask for repetition or clarification on questions, partially performed serial sevens, and counted backwards from 20 by threes, tasks that assess his attention and concentration skills. However, he reported that he had difficulty focusing if he was not interested in the subject matter. He worked at an adequate pace during the evaluation but reported that his energy level was low and that he was easily fatigued. He described signs of neuropsychological impairment, and his cognitive dysfunction and/or depression may interfere with his

5

ability to keep up with others. As it relates to his abilities to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public, he reported that he sometimes fought with classmates, but got along with his teachers at school. He indicated that he shared an adequate relationship with supervisors, coworkers, and customers in the workforce, and indicated that he had friends. Nonetheless, he indicated that his emotional difficulties resulted with social withdrawal, and while he interacted appropriate with the examiner, he appeared depressed. Finally, in the area of dealing with normal pressure in a competitive work setting, his description of his work history did not suggest that he emotionally decompensated from exposure to the workplace. He reported no mental health treatment, but his remarks suggest that stressful situations magnify cognitive deficits such as memory problems leading to mental fatigue, mental confusion, and frustration which further exacerbate his depression (6F).

The claimant continued treating for his severe impairments. During an April 21, 2021 evaluation with Dr. Parmar, he reported multiple recent falls as well as urinary and bowel incontinence that started two weeks prior. He displayed normal breath sounds, a normal heart rate, and a regular heart rhythm upon examination. He had normal musculoskeletal range of motion, to include regular cervical spine range of motion, and he had no focal neurological deficit. He appeared disoriented, and he was advised to follow up with neurology for assessed encephalopathy, recurrent falls, and memory loss (8F/7-14). The record reflects that the claimant continued to treat with Dr. Vallabhaneni as of December 20, 2021, but there are no associated treatment notes (9F/1). Finally, evaluation notes from a telehealth visit from December 21, 2021 reflect that the claimant recently tested positive for COVID-19. He complained of cough, difficulty breathing, body aches, and chills. However, he denied chest pain, palpitations, dizziness, or depression.

Additionally, no issues with persistent incontinence or falls were raised (8F/15-21). Additionally, the record reflects that the claimant's weight has been at obese levels since the alleged onset date. Specifically, treatment records indicate that the claimant is five feet and six tall, that his weight was as high as 188 pounds, and that his body mass index reading was as high as 30.34 (1F/8, 4F/14). As outlined previously, obesity is a medically determinable impairment that commonly leads to, and often complicates, chronic diseases. Therefore, it is reasonable to assume that the claimant's weight contributed to the limitations associated with his previously discussed severe impairments.

Therefore, the evidence supports that the claimant experienced limiting signs and symptoms associated with his severe impairments. Imaging of his cervical spine showed C4-5 spondylosis with mild central canal stenosis and moderate bilateral neural foraminal stenoses, ossification of posterior longitudinal ligament at C5, C3-C4 moderate left neural foraminal stenosis, and slight reversal of cervical lordosis at C4-5 (2F/13-14). He has a history of a right hand fracture, and his weight was within the obese range (1F/8, 3F/24, 4F/14). A head CT scan showed evidence of

cerebral and cerebellar atrophy, lacunar infarcts in the bilateral basal ganglia, as well as a confluent lucency in cerebral white matter that may be referrable to advanced chronic microvascular ischemic disease (2F/13). A brain MRI revealed multiple minute acute lacunar infarcts involving the right periventricular and deep white matter and to a lesser degree the right parietal cortex, in a distribution suggestive of embolic episode as well as atrophy and chronic ischemic changes, out of proportion to patient's age, with bilateral remote lacunar infarcts in the basal ganglia (2F/14). An echocardiogram showed moderately decreased left ventricular systolic function with an estimated ejection fraction is 35-39 percent, a moderately hypokinetic anteroseptal, normal right ventricle function, and a mildly dilated left atrial size (2F/8-154, 3F/26-42). Additionally, EKG findings were consistent with atrial fibrillation for which he required cardioversion on two separate occasions in September 2020 (2F/8-154, 2F/156-171, 3F/26-42, 4F/14-19). Significant associated clinical physical findings included an unsteady gait and station, 4 to 4+/5 strength in his right lower extremity, 4+/5 left knee extension strength, increased lightheadedness with vertical head movements, and an irregularly irregular heart rate upon examination (1F/8-9, 3F/53-56, 4F/14-19). After his cerebral vascular accident, the claimant reported issues with short-term memory loss, speech deficits, impaired focused/concentration, slowed cognitive functioning, depressed mood, and social isolation (10E, 4F/7-13, 6F, 8F/7-14). Significant associated clinical findings included a depressed mood, a flat affect, tearfulness, and disorientation (6F, 8F/7-14).

(ECF No. 7, PageID #: 128-32).

## IV.   The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2. The claimant has not engaged in substantial gainful activity since August 31, 2020, the amended alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: atrial fibrillation status post cardioversion, moderate aortic stenosis, cerebral vascular accident/suspected cardioembolic stroke, cervical spondylosis/degenerative disc disease of the cervical spine, right hand fracture, obesity, encephalopathy/unspecified neurocognitive disorder, and unspecified depressive disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for 6 hours of an 8-hour workday, unlimited push and pull other than shown for lift and/or carry; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop and crawl; avoid concentrated exposure to extreme heat; avoid all exposure to hazards – unprotected heights, hazardous machinery or commercial driving; can perform simple routine tasks (unskilled work) with superficial interaction (meaning of a short duration for a specific purpose) with others; can perform work with infrequent change where changes are explained in advance; can perform work with no fast pace or high production quotas; can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility; frequent handling and fingering with the right upper extremity.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

. . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2020, through the date of this decision (20 CFR 404.1520(g)).

(ECF No. 7, PageID #: 122-24, 127, 134-35).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

9

### C. Discussion

Claimant raises two issues on appeal, arguing that (1) the ALJ erred at Step Three "when she failed to comply with the relevant Social Security Rulings, 17-2p and 19-2p, and find that the combination of Plaintiff's obesity and residuals from his strokes equaled a Listing;" and (2) the ALJ erred "when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms preluded him from engaging in substantial gainful activity on a full-time and sustained basis." (ECF No. 10 at 1).

**1. The ALJ did not err in finding that Claimant did not meet or equal a listing.**

Claimant's first argument addresses the ALJ's determination that Claimant's impairments did not meet or equal a listing, specifically Listing 11.04. To meet a listing, the claimant "must satisfy all of the [listing's] criteria." *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *3 (6th Cir. Aug. 10, 2020). The claimant "bears the burden of showing that an impairment meets or equals a listed impairment." *Id.* If the ALJ's listing finding is supported by substantial evidence, based on the record as a whole, the Court will defer to the ALJ's finding, "[e]ven if the record could support an opposite conclusion." *Id.* at *4. Moreover, if the ALJ's listing finding is not supported by substantial evidence, the error is harmless if the claimant cannot show that his impairments met or medically equaled a listing. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

Listing 11.04 addresses vascular insult to the brain, which is "commonly referred to as stroke or cerebrovascular accident." 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.00(I)(1). Listing 11.04 is separated into three categories as follows:

> A. Sensory or motor aphasia resulting in ineffective speech or communication (see 11.00E1) persisting for at least 3 consecutive months after the insult; or

10

> B. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult; or
>
> C. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a) and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:
>
> > 1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> > 2. Interacting with others (see 11.00G3b(ii)); or
> > 3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> > 4. Adapting or managing oneself (see 11.00G3b(iv)).

*Id.* at § 11.04. As relevant to 11.04(A), "[i]neffective speech or communication means there is an extreme limitation in your ability to understand or convey your message in simple spoken language resulting in your inability to demonstrate basic communication skills, such as following one-step commands or telling someone about your basic personal needs without assistance." *Id.* at § 11.00(E)(1). In § 11.04(B), "[d]isorganization of motor function means interference, due to your neurological disorder, with movement of two extremities." *Id.* at § 11.00(D)(1).

> Here, the ALJ explicitly addressed Listing 11.04, stating:
>
> The undersigned considered the claimant's cerebral vascular accident/suspected cardioembolic stroke under listing 11.04 of the Regulations and finds that it does not meet or medically equal a listing. As detailed below, the evidence does not support that more than three months past his vascular accident he had sensory or motor aphasia resulting in ineffective speech or communication. There is no evidence of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. Further, the record does not support evidence of a marked limitation in physical functioning (see 11.00(G)(3)(a)) along with a marked limitation in one of the areas of mental functioning outlined below that persisted at least three consecutive months after the insult.

(ECF No. 7, PageID #: 124).

Claimant argues that the ALJ "failed to cite any medical evidence which either supported or was contrary to the relevant Listing" such that the ALJ's conclusion was not supported by

11

substantial evidence. (ECF No. 10 at 9-10). He asserts that "[e]ven if he did not satisfy each and every element of Listing 11.04 (no prescription for assistive device), the combination of his multiple severe impairments equaled the criteria of Listing 11.04." (*Id.*at 10). Additionally, Claimant argues that "the ALJ stated that she considered Plaintiff's obesity and that it imposed significant functional limitations (TR. 105), but she erred when she failed to account for the combination of Plaintiff's obesity and the acknowledged related impairments." (*Id.* at 11). Claimant asserts that "[b]ased on the combination of [his] residual problems from his strokes and his obesity, substantial evidence did not support a finding that he could perform work at the light level of exertion" and the ALJ "erroneously did not build an accurate and logical bridge between the evidence documenting Plaintiff's disabling problems and the ALJ's decision to deny benefits." (*Id.* at 12-13).

The Commissioner responds that courts "look to the decision as a whole in evaluating the ALJ's Step Three conclusions" and "the ALJ discussed the criteria of the listing throughout the decision." (ECF No. 13 at 9). The Commissioner argues that Claimant has not shown that his limitations were so severe as to equal Listing 11.04 because the ALJ noted that Plaintiff had normal speech and Claimant "did not present medical evidence describing how the combination of his impairments rendered him unable to communicate;" "while there was evidence that Plaintiff had an unsteady gait, the ALJ noted that there were multiple instances where his gait was normal;" despite Claimant's allegations of weakness in his upper extremities, "the ALJ explained that in September 2020—following his stroke—Plaintiff exhibited normal strength in all extremities;" "Plaintiff's wife said he was able to drive, thereby suggesting that he could stand up from a seated position;" and "the ALJ concluded that Plaintiff had no more than moderate limitations in the four functional areas." (*Id.* at 10-11). As to Claimant's obesity argument, the Commissioner responds

that "contrary to Plaintiff's argument, the ALJ not only considered whether his obesity would affect his ability to work but she took the condition into consideration when assessing the RFC." (*Id.* at 12).

In reply, Claimant seems to argue that the ALJ's conclusions that "the evidence supported the fact that Plaintiff had experienced limitations associated with his severe impairments" and that Claimant "had functional limitations related to his fatigue and loss of strength" are inconsistent with her Step Three determination that Claimant did not meet or equal a listing. (ECF No. 14 at 1).

As the Commissioner argues, the Court "may look to the decision as a whole in evaluating the ALJ's Step Three conclusions." *Scott v. Kijakazi*, No. 4:22CV878, 2023 WL 4010687, at *8 (N.D. Ohio June 15, 2023) (collecting cases). Doing so, the Court agrees with the Commissioner that the ALJ adequately discusses her conclusions and properly found that Claimant did not meet or equal Listing 11.04. The ALJ summarized the medical evidence and observed that "[t]he record contains evidence of normal motor strength, normal sensation to all modalities, normal finger to nose coordination, normal speech, normal musculoskeletal range of motion, to include full range of motion of his neck/cervical spine, as well as a normal gait." (ECF No. 7, PageID #: 132). The medical records cited in support of this conclusion include indications that Claimant was "making good strides following his stroke" and had a normal gait and range of motion. (*Id.* at PageID #: 368, 535, 699). While Claimant points to evidence of his stroke, he fails to point to any evidence—beyond his own testimony—to support that for three consecutive months afterwards, he experienced ineffective speech or communication, disorganization of motor function in two extremities, or a marked limitation in physical functioning and one of the areas of mental functioning. Thus, he has failed to show that he met or equaled Listing 11.04.

13

Concerning Claimant's obesity, the Court again agrees with the Commissioner that the decision makes clear that the ALJ considered Claimant's obesity in rendering her decision and determining Claimant's functional limitations. SSR 19-2p provides that "the functional limitations caused by the [medically determinable impairment] of obesity, alone or in combination with other impairment(s), may medically equal a listing." 2019 WL 2374244, at *4. In setting forth what physical limitations she found warranted, the ALJ stated that "[d]ue to [Claimant's] cervical spine degeneration and the effects of his obese body habitus, he should only occasionally stoop and crawl." (ECF No. 7, PageID #: 132). Thus, the ALJ did not fail to consider the combined effect of Claimant's impairments but rather found that even the combined effect did not result in limitations that equaled a listing.

Overall, substantial evidence supports the ALJ's conclusion that Claimant did not meet or equal Listing 11.04. Accordingly, the Court must defer to the ALJ's decision "[e]ven if the record could support an opposite conclusion." *Nash*, 2020 WL 6882255, at *4.

**2. Substantial evidence supports the ALJ's evaluation of Claimant's symptoms.**

In his second argument, Claimant challenges the ALJ's evaluation of his symptoms pursuant to SSR 16-3p. The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.

Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: daily activities; location, duration, frequency, and intensity of the pain or other symptoms; factors

14

that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; treatment other than medication; any measures other than treatment the individual uses to relieve symptoms; and any other factors concerning the individual's functional limitations and restrictions. 2017 WL 5180304 at *7-8. The ALJ need not analyze all seven factors but should show that she considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). SSR 16-3p states:

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248–49), *report & recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

After summarizing the evidence, Claimant argues that "[t]he cumulative evidence in this matter supported [his] complaints regarding his continuing weakness on his right side, difficulty with speech, falls, and memory problems" and "the ALJ failed to articulate any supportable

15

rational for her finding that Plaintiff's statements . . . were not entirely consistent with the medical evidence." (ECF No. 10 at 16). Accordingly, he argues that "the ALJ failed to support her conclusion with substantial evidence supported by the record, necessitating a remand of this matter." (*Id.* at 17).

The Commissioner responds that the "ALJ discussed the relevant evidence and reasonably concluded that Plaintiff had some limitations but failed to show that his symptoms were of the severity to preclude all work given the objective medical evidence, Plaintiff's treatment history, and his activities of daily living." (ECF No. 13 at 14). The Commissioner asserts that Claimant's "argument amounts to nothing more than an improper invitation for the Court to re-weigh the evidence." (*Id.* at 17).

The ALJ explained her findings concerning Claimant's allegations, stating:

> However, the claimant's statements about the intensity, persistence, and limiting effects of his symptoms are inconsistent because the level of limitation alleged is not altogether supported by the objective findings. Findings of heart rate/rhythm abnormalities are not consistent in the record (4F/7-13, 4F/20-25, 8F/7-14). As of October 2020, a cardiac study showed overall normal left ventricular systolic function with an ejection fraction between 60-65 percent (3F/57). The record contains evidence of normal motor strength, normal sensation to all modalities, normal finger to nose coordination, normal speech, normal musculoskeletal range of motion, to include full range of motion of his neck/cervical spine, as well as a normal gait (1F/8-9, 2F/166- 167, 4F/20-25, 8F/7-14). There is no evidence that he required treatment for ongoing incontinence or that he used an assistive ambulatory device, and within a month of starting physical therapy he reported improvement in his lightheadedness/dizziness, and he exhibited improved balance with both dynamic and static activities (2F/172-173, 3F/53-56). The record contains no evidence that the claimant received mental health treatment since the alleged onset date, and it was noted that he was able to drive a car to pick up his daughter from school, perform light household chores, shop in stores, pay his bills, use a checkbook/money orders, focus sufficiently to watch television, and interact with his family (10E). Findings of disorientation are not consistent in the record, and he exhibited normal speech upon examination (1F/8-9. 4F/7-13, 4F/14-19, 4F/20-25). The record contains findings of a cooperative, polite, and friendly presentation, normal/adequate mood, affect, and judgment, normal memory, as well as the ability to complete tasks that assess concentration and attention without the need for repetition or clarification (4F/7-13, 4F/14-19, 6F).

(ECF No. 7, PageID #: 132).

Based on this discussion, the Court agrees with the Commissioner that the ALJ properly considered the relevant factors under SSR 16-3p. The ALJ considered Claimant's daily activities, noting that he drove, performed chores, shopped in stores, paid bills, focused on television, and interacted with family. (*Id.*). The ALJ also considered Claimant's treatment, noting that Claimant improved with physical therapy, and did not receive ongoing treatment for incontinence or use an assistive device. (*Id.*). The ALJ also relied on the opinion of the State agency consultants and crafted an RFC which included additional limitations "to account for claimant's subjective complaints and more recent treatment." (*Id.* at PageID #: 133). Thus, substantial evidence supports the ALJ's treatment of Claimant's symptom testimony. As the Court will not reweigh the evidence when reviewing an ALJ's decision, no compelling reason exists for the Court to disturb the ALJ's credibility finding. *Cross*, 373 F. Supp. 2d at 732.

## VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying to Plaintiff benefits. Plaintiff's Complaint is DISMISSED.

Dated: February 20, 2024

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE